## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                      Case No: 2:15-cr-7-FtM-29CM

CHRISTOPHER HALL

_____

## REPORT AND RECOMMENDATION[1]

### I.   Background

Before the Court is Defendant Christopher Hall's Motion for Pre-Trial Suppression Hearing ("Motion") (Doc. 28), filed on April 16, 2015, which was referred to the undersigned by the Honorable John E. Steele for a Report and Recommendation.   The United States filed its response in opposition on April 30, 2015 (Doc. 30).   The undersigned held an evidentiary hearing on May 21, 2015. With the Court's permission, Defendant filed a Memorandum of Law Advising the Court of Supplemental Authority (Doc. 44) on May 29, 2015.   This case currently is set for the trial term beginning August 3, 2015, with a status conference to be held on July 13, 2015.   Doc. 49.

Defendant Christopher Hall is charged in a two-count indictment with receipt and distribution of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1); and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1).   Doc. 3.   Defendant seeks to suppress all direct and derivative evidence,

_____

[1] Written objections may be filed within fourteen (14) days from the date of filing this Report and Recommendation.   A failure to file timely objections waives a party's right to *de novo* review.   28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; M.D. Fla. R. 6.02(a).

including physical evidence and statements, gathered during searches of Defendant's computer on May 9, 2014 and residence on June 9, 2014.   For the reasons that follow, it is respectfully recommended that the Motion be denied.

## II.    Summary of Evidence

The Government called one law enforcement witness to testify at the suppression hearing, Task Force Agent ("TFA") Zachary Ewert.  The Government also introduced four exhibits, which were admitted into evidence: (1) the search warrant for 26641 Rosewood Pointe Circle, Unit 203, Bonita Springs, Florida 34135; (2) volume I of the transcript of Defendant's interview with TFAs Ewert and Bunch; (3) volume II of the transcript of Defendant's interview with TFAs Ewert and Bunch; and (4) a CD containing the audio recording of Defendant's interview with TFAs Ewert and Bunch.  *See* Doc. 43.  Defendant called one law enforcement witness, TFA Chris Tissot, but did not introduce any exhibits.   The testimony is summarized below.

### a.  TFA Ewert

Ewert is a detective with the Collier County Sheriff's Office ("CCSO") and currently is assigned to the FBI's Child Exploitation Task Force.[2]  His role on the task force involves investigating crimes on the internet involving children, particularly the possession and distribution of child pornography.   Ewert received training in basic peer-to-peer online undercover investigations, including education

---

[2] Ewert has been so assigned for approximately two and a half years, and employed by CCSO for approximately ten years.  He also worked for police departments in Grand Rapids, Michigan and Myrtle Beach, South Carolina before joining CCSO.

related to peer-to-peer transferring and trading of child pornography.   Doc. 55 at 12-13, 44-46.   He testified that each of the training sessions lasted approximately two and a half days, for an approximate total of 45 hours of training on peer-to-peer software.   *Id.* at 46.   Ewert has not received any advanced training in peer-to-peer networks or computer related crimes.   *Id.* at 13.

Beginning in May 2014, Ewert conducted an undercover investigation into crimes related to child pornography.   Ewert testified that on May 9, 2014, his computer used BitTorrent software called Roundup, which is available exclusively to law enforcement, to connect with IP address 98.208.228.117, which was geo-located to Bonita Springs, Florida.   Doc. 55 at 23-24, 32.   Ewert explained that BitTorrent is a peer-to-peer network that operates on the internet and enables multiple users to download and share images and other content.   Users connect to other peers to download the desired content, and each user must have both a torrent and the related content to be able to share that content.   *Id.* at 14-15.

To obtain content over a peer-to-peer network, Ewert testified that a user must have peer-to-peer software, and use that software to search for the particular content he seeks.   *Id.* at 15.   Then, the user can select a particular torrent for download to his computer from a list of torrents produced as a result of the particular search terms used.   *Id.* at 14-15.   Once a specific torrent is downloaded to the user's computer, the torrent provides the user with instructions on how to obtain the torrent's contents.   *Id.* at 15.   Next, the user's computer connects to other users who possess the torrent in a shared folder on their computers, which enables them to share the

particular torrent's contents. *Id.* All users on the BitTorrent network, regardless of the particular type of software, have the ability to share information.

Ewert explained that a "torrent," as he used that term at the hearing and in his Affidavit in support of the search warrants at issue in this case, is a download available from the internet which contains a description of the content and its size. Doc. 55 at 16. Each user on the BitTorrent network who possesses a particular torrent has the entire torrent, but may not have the entire content referenced in the torrent. *Id.* at 17. The public user's computer therefore connects with multiple computers and can download bits and pieces from multiple other users to receive collectively the whole content of a particular torrent—provided each of the other users not only has the information on their computer but also has the information stored in a shared file with the sharing feature enabled. *Id.* at 16. Therein lies the main distinction[3] between the law enforcement Roundup BitTorrent software and that used by the general public: law enforcement is able to achieve a "single source download," meaning that the Roundup software enables officers to download the requested information only from one person, whereas public users may connect to multiple users and simultaneously download portions of the content from multiple people. *Id.* at 18-19.

Ewert testified that to conduct investigations using the Roundup BitTorrent software, he first identifies a particular geographic region and then the software

---

[3] Ewert also testified that the general public uses BitTorrent software to share movies, music and other items, while the Roundup program used by law enforcement looks only for content constituting child pornography. Doc. 55 at 22.

connects to the Internet Crimes Against Children ("ICAC") database, which also is available for use solely by law enforcement.   Doc. 55 at 19.   The ICAC database then queries the region and identifies internet protocol ("IP") addresses that are known to have possessed torrents related to child pornography and child pornography content based upon the particular torrent info hash.[4]   Doc. 55 at 30-31, 47-48.   The ICAC database then imports the IP addresses and the torrents to Ewert's computer, which then attempts to connect to the target IP address and download whatever child pornography the IP target has.   Ewert conceded on cross-examination that he is not familiar with the intricacies of the ICAC database and knows only the information he received in training, but testified that based on his training and experience he knows it to be reliable.   *Id.* at 48-50.   Prior to downloading any materials, Ewert is able to see details of the transfer, such as the connection between the corresponding computers, the date, time, name of the software the target IP address was using, and the actual download(s).   *Id.* at 29.   Ewert explained that this is the process he employed in May 2014, when his investigation led him to IP address 98.208.228.117, later identified as being assigned to Defendant Christopher Hall.   *Id.* at 19.

Through his computer's direct connection to IP address 98.208.228.117, Ewert successfully downloaded several images of child pornography.   *Id.* at 32.   He then

---

[4] Ewert described the torrent info hash as "a series of characters that is like a digital fingerprint."   Doc. 55 at 29.   The ICAC database identifies torrents known to possess instructions on how to obtain child pornography based upon their unique info hash.   *Id.* at 30.   Ewert further testified that ICAC obtains this information using "trackers," which comb the peer-to-peer networks looking for specific torrents, and then identify IP addresses that possess those torrents, as well as child pornography.   *Id.* at 30-31, 77-79.

requested and received a subpoena for issuance to Comcast, the internet service provider ("ISP"), requesting the subscriber information associated with IP address 98.208.228.117.   *Id.* at 24.   In response to the subpoena, Comcast identified the physical address associated with the subscriber as 26551 Rosewood Point Circle, Unit 203, Bonita Springs, Florida.   *Id.* at 24, 34.   Based upon this information, Ewert then sought and obtained a search warrant for that address on June 5, 2014.   *Id.* at 24-25.

Ewert and other law enforcement officers and agents executed the search warrant on 26551 Rosewood Point Circle, Unit 203, on June 9, 2014.   *Id.* at 33. Ewert contacted a Postal Inspector, who identified Defendant Christopher Hall as a person receiving mail at 26551 Rosewood Point Circle, Unit 203, and Ewert verified this information through the Florida driver's license database, which identified Christopher Hall as a resident of 26551 Rosewood Point Circle, Unit 203, and two vehicles registered to that address.   *Id.* at 34.   Ewert observed both vehicles in the parking lot on different occasions.

When Ewert and other officers first arrived at the residence on June 9, 2014, no one was home.   *Id.* at 35.   SA Ward and TFA Tissot went to Defendant's workplace, where they told Defendant that his residence had been burglarized and asked him to accompany them back to the residence.   *Id.* at 36.   Ewert explained that the officers chose to tell Defendant that his residence had been burglarized rather than the true purpose for their visit to prevent the possibility that Defendant would remotely wipe incriminating evidence and other information from his computer

using his cell phone, or otherwise remotely tamper with evidence.   *Id.*   Defendant agreed to return to his residence, but he and the officers did so in separate vehicles. *Id.*   When Defendant returned to his residence, Ewert informed Defendant that his home had not been burglarized, and that the real reason for the agents' presence was execution of a search warrant on his residence.   *Id.* at 36, 69-70.   Ewert then told Defendant that he did not have to stay at the residence during execution of the warrant and was free to leave, but that Ewert was interested in speaking further with Defendant if Defendant wished to do so after the agents entered and secured the home.   *Id.* at 37, 39.   Defendant gave Ewert the keys to the residence, a condominium unit located on the second floor.   *Id.* at 38.

Ewert testified that he told Defendant that if he wished to stay at the condo, his movement would be limited within the condo for the safety of the officers searching the residence, but reiterated that Defendant was free to leave if he chose to do so.   *Id.* at 39, 40.   Defendant agreed to speak with Ewert, who advised Defendant that he was not under arrest and could leave at any time.   *Id.* at 39. Defendant was neither handcuffed nor detained at any time during the interview, which lasted approximately an hour and a half and was conducted on Defendant's lanai and then in Defendant's master bedroom when it became too hot outside.   *Id.* at 39, 40-41.   TFA Kevin Bunch also was present during Ewert's interview with Defendant.   *Id.* at 40.   Ewert described the conversation as "a very relaxed atmosphere" and stated he and TFA Bunch "tried making it very light."   *Id.* at 40.

Ewert did not provide Defendant with *Miranda*[5] warnings at any time on June 9, 2014.  *Id.* at 71.   Defendant never requested an attorney, although he did ask Ewert and Bunch whether they thought he should have one.   *Id.* at 74-75; *see also* Gov't Ex. 2 at 10-11.   Defendant never asked or attempted to leave.   Doc. 55 at 40.

During the interview, Defendant admitted to downloading and possessing child pornography.   *Id.* at 41.   Defendant described how he acquired the images using BitTorrent technology, and ultimately admitted that he understood that he was sharing content with other people using the internet.[6]   The interview was recorded

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Defendant first stated that he was not aware that by leaving images in his download folder they remain available to others on the BitTorrent network:

[Ewert]: Now you understand that if you leave those pictures in your folder you're sharing to everyone else that's searching for those images?

[Defendant]: No.

[Ewert]: Yeah.

[Defendant]: No I was not aware.

Gov't Ex. 2 at 21-22.   Later in the interview, however, Defendant conceded to familiarity with how BitTorrent works:

[Ewert]: Now I know that in the past I asked, I think I did now when you're on the Peer to peer and you couldn't show your, your option of sharing whatever is in your folder so if I was looking for "Lsmodels" and you were on-line I would –

[Defendant]: Pull 'um from my –

[Ewert]: Right, right you understand that?

[Defendant]: Yeah I know that I -

[Ewert]: Unless you turn off the sharing.

[Defendant]: - used to not share –

———————————————

[Ewert]: Right.

[Defendant]: - I used to not share.

[Ewert]: So you used to not share it but you do now or?

[Defendant]: I don't know where that is.

[Ewert]: That setting but you're familiar with –

[Defendant]: I, when you mentioned it yeah I mean I know at one point you can decide to be part of that sharing file or not –

[Ewert]: Right.

[Defendant]: - hence to file share.

[Ewert] Right exactly cause that's what "Peer to peer" is, you know that's just a quicker way to download whatever you're looking for, so the people that have it they can connect directly to you and they can pull off whatever you're looking for if you have that image.

[Defendant]: Right.

[Ewert]: You knew that?

[Defendant]: I, I've, I would say yes but I did not, I wasn't aware that that was, it was more me pulling in, I wasn't thinking what I had pulling out.

[Ewert]: Like for example you have the Ls up, "LSmodels" in your folder; I get on a separate computer and I search it and it connects to yours because you're sharing I can pull from your folder. Does that make sense?

[Defendant]: Yes.

[Ewert]: Ok so you understand that?

[Defendant]: Yeah.

[Ewert]: Ok.

[Bunch]: Just since you went, stop me if I'm wrong, but since you got this computer and you downloaded the "Bittorrent" on there you, you didn't turn sharing off I take it?

[Defendant]: It didn't, I didn't, I don't think I actively did but like I, I didn't know either way.

- 9 -

and transcribed, and the transcript and recording were admitted into evidence at the suppression hearing as Government's Exhibits 2-3 and 4, respectively.  *See* Doc. 43. At the conclusion of the interview, Ewert informed Defendant that he would be in contact and gave Defendant his business card, and the agents gathered their property and the items they had seized pursuant to the warrant and left the residence.   Doc. 55 at 43.   Defendant was not arrested at that time.   *Id.*

   *b.  TFA Tissot*

TFA Chris Tissot was present on June 9, 2014 when TFA Ewert and other agents and officers went to 26551 Rosewood Point Circle, Unit 203 to execute the

---

[Ewert]: Right.

[Bunch]: Where, where did you download cause no computer comes with like a "Bittorrent" on it?

[Defendant]: Just yeah.

[Bunch]: Where did you download?

[Defendant]: Just download, dialed or downloaded whatever and you search "Bittorrent" and it's a free download.

[Bunch]: Ok.

[Ewert]: And you know you need that to download your torrent?

[Defendant]: To download it whatever –

[Bunch]: Yeah

[Defendant]: - from whatever sight you're going to.

[Ewert]: Yeah you knew that?

[Defendant]: Yes.

Gov't Ex. 3 at 14-16.

search warrant.   Tissot went to Defendant's place of employment, which he estimated took about 15 to 20 minutes, along with Agent Ward, where they told him they were investigating a burglary at his residence.   Doc. 55 at 80-82.   Tissot did not inform Defendant of the search warrant, and did not provide Defendant with Miranda warnings at any time.   *Id.* at 82.   Defendant either followed Tissot and Ward, or they followed Defendant, back to his residence in separate vehicles.   *Id.* at 83.   Tissot testified that, upon arriving at Defendant's residence, Ewert contacted Defendant and, because it was Ewert's case, took over the investigation.   Tissot did not provide Defendant with Miranda warnings at any time on that day.   *Id.* at 82. Defendant ultimately was arrested in connection with this case on February 12, 2015. *See* Doc. 11.

## III.   Analysis

Defendant argues that suppression is warranted on three grounds: (1) the warrantless search of Defendant's computer constituted an unlawful trespass by the Government, in violation of the Fourth Amendment; (2) the Affidavit in support of the Application for the search warrant of Defendant's residence contained materially false and misleading information; and (3) TFAs Ewert and Bunch conducted a custodial interrogation of Defendant without first advising him of his *Miranda* rights.

### a.   Whether the May 9, 2014 warrantless search of Defendant's computer constituted an unlawful trespass

Defendant first argues that law enforcement's search of his computer using the BitTorrent Roundup program and information received initially from the ICAC database constitutes an unlawful trespass because those programs allowed the

Government greater access and possess greater capabilities than publicly available BitTorrent programs.   The Government asserts that Defendant had no reasonable expectation of privacy in shared files made publicly available on a peer-to-peer network.   The Court agrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…." U.S. Const. Am. IV.   "The Fourth Amendment's prohibition against unreasonable searches and seizures 'protects an individual in those places where [he] can demonstrate a reasonable expectation of privacy against government intrusion' and 'only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search.'"   *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *United States v. Cooper*, 203 F.3d 1279, 1283-84 (11th Cir. 2000)).

In *Kyllo v. United States*, the United States Supreme Court explained that where the Government "uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant."   533 U.S. 27, 40 (2001).   This is precisely what Defendant asserts both the ICAC database and law enforcement's BitTorrent Roundup program do.   The Supreme Court clarified, however, that "a Fourth Amendment search does *not* occur – even when the explicitly protected location of a *house* is concerned – unless 'the individual manifested a subjective expectation of privacy in the object of the

challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'"   *Id.* at 33 (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (alteration and emphasis in original)).   Thus, the Court must determine whether Defendant had an expectation of privacy in shared files containing instructions on how to obtain images of child pornography and, if so, whether such expectation was reasonable.   The Court answers both questions in the negative.

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."   *Katz v. United States*, 389 U.S. 347, 351 (1967).   Numerous courts, including others in this circuit and district, have repeatedly held that a defendant has no expectation of privacy in files made available to others.   In *United States v. Norman*, the Eleventh Circuit affirmed the district court's denial of a motion to suppress, finding that the defendant did not have an objectively reasonable expectation of privacy in shared files on his computer.   448 Fed. Appx. 895 (11th Cir. 2011).   The court rejected the defendant's contention that the use of software available only to law enforcement contravened the Supreme Court's decision in *Kyllo* and amounted to a violation of the Fourth Amendment.   448 Fed. Appx. at 897.   The court explained that, unlike the defendant in *Kyllo*, "the contents of the shared folder on Norman's computer were knowable to law enforcement without physical intrusion to Norman's house because this information was also available to members of the public."   448 Fed. Appx. at 897.   The court held that even if the defendant in *Norman* held a subjective expectation of privacy in the shared files, as Defendant here, such expectation was not objectively reasonable,

because his computer featured a peer-to-peer file sharing program that the Defendant used and that allowed others to access shared files.   *Id.*

Similarly, in *King*, the Eleventh Circuit held that a defendant did not have an objectively reasonable expectation of privacy in the content of his computer when he made the content available to others over a shared military network.   509 F.3d at 1342.   *See also Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 452 (C.D.Cal. 2007) ("Even if the users are engaged in legal file sharing, they have little to no expectation of privacy because they are broadcasting their identifying information to everyone in the BitTorrent 'swarm' as they download the file."); *In re Verizon Internet Servs.*, 257 F.Supp.2d 244, 267 (D.D.C. 2003) ("[I]f an individual subscriber opens his computer to permit others, through peer-to-peer file-sharing, to download materials from that computer, it is hard to understand just what privacy expectation he or she has after essentially opening the computer to the world."), *rev'd on other grounds*, *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003).

Other federal courts have addressed arguments similar to that made by Defendant here with respect to warrantless downloads of images from computers. In *United States v. Nolan*, a case remarkably factually similar with respect to the investigative techniques employed, including the use of the ICAC database, the court rejected the defendant's argument that officers need warrants to search and download images from suspects' computers.   No. 1:11CR 82 CEJ, 2012 WL 1192183 (E.D.Mo. Mar. 6, 2012) (unpublished Report and Recommendation), *adopted by* 2012

WL 1192757 (E.D. Mo. Apr. 9, 2012).   That court explained:

> On the contrary, [the officer's] browsing and downloading of images from the defendant's computer was a peer-to-peer sharing.   The nature of peer-to-peer activity is that the files are made available for any other "peer" to receive....
>
> As the affidavit explains, once the files are placed in the "shared" folder, they are available to anyone.   "All files placed in that user's designated "shared" folder are available to anyone on the world wide network.
>
> The files are no longer private.   When [the defendant] placed the images in his shared folder, he was offering them to the world.   Of course, the more he shared with others, the system is designed so that [the defendant] has access to more files from others.
>
> [The defendant's] privacy was not invaded by [law enforcement] because [defendant] offered [the files] to [law enforcement] and anyone else on the world wide network.
>
> Thus, [law enforcement] did not need a search warrant to unload the images.

2012 WL 1192183 at *10-11.   The same is true here.

When interviewed by agents at his home, Defendant admitted to familiarity with how BitTorrent programs operate to download—and share—files from the internet, despite initially saying that he was not aware that by leaving files in his shared folder he was sharing them with others.   *See* Gov't Ex. 2 at 21-23; Gov't Ex. 3 at 3, 5-7, 14-16; *see also* note 6, *supra*.   Defendant can hardly be said to have exhibited even a subjective expectation of privacy, because he not only admitted to agents that he was aware that files were shared over BitTorrent networks but also that he had shared the content with others.   *See* note 6, *supra*.   Even if he had a subjective expectation of privacy, as in *Norman*, *supra*, such expectation was not

objectively reasonable because Defendant knowingly placed the files in public domain.

Neither the ICAC database, nor the Roundup program, allowed law enforcement greater access than the general public had to the files Defendant made publicly available for sharing on the BitTorrent network using peer-to-per software. Although Ewert's testimony as to his lack of knowledge about the ICAC database certainly warrants consideration, Defendant simply cannot overcome the prerequisites to Fourth Amendment protection: Defendant can have no objectively reasonable expectation of privacy, even if he were to have a subjective one, in files and content that he intentionally made available for everyone using peer-to-peer networks—including law enforcement—to access and download.   Without a reasonable expectation of privacy, there is no Fourth Amendment violation. Accordingly, the Court will not recommend suppression of the evidence on this ground.

> *b. Whether the Affidavit in support of the application for search warrant contained materially false and misleading information*

Defendant next argues that Ewert's sworn Affidavit in support of the search warrant falsely states that law enforcement downloaded images of child pornography from the IP address later attributed to Defendant, and these statements were material to the determination that probable cause existed for the issuance of a search warrant.   Specifically, Defendant takes issue with the following statements: that on May 9, 2014, TFAs "downloaded one (1) torrent file which contained numerous child pornography images"; "Downloads: **The following child pornography files were

contained in torrent hash file 6abc10f99152df20f9947176da69c408291810a6**"; and the list and descriptions of specific images contained in that torrent hash file.[7]   Doc. 28 at 10.

Defendant contends that the statements in the Affidavit that TFA Ewert downloaded child pornography in certain hash files are false and were made deliberately or recklessly.   By contrast, the Government asserts that Ewert's use of the word ".torrent" to refer generally to both the actual ".torrent" file and the instructions on how to download child pornography contained in the file, as well as the subsequently identified images of child pornography, is consistent with the manner in which law enforcement uses the term in everyday investigations and language.   Notably, it is undisputed that a ".torrent" file does not contain actual images of child pornography.   *See* Doc. 30 at 6-7 ("The government agrees that a '.torrent' file does not contain the actual child pornography images, but that the '.torrent' file is the vehicle by which the agents obtained the child pornography images from the Defendant's device.").   Ewert conceded on cross examination that the torrent file contains only instructions; it does not contain images, including images of child pornography.   Doc. 55 at 57, 59.

The search warrant application and affidavit drafted by Ewert in this case were admitted as Government's Exhibit 1.   *See* Doc. 43.   During the hearing, Ewert explained that his description of the BitTorrent network found in the beginning

---

[7] Because the application for search warrant, Affidavit and search warrant were admitted into evidence as Government's Exhibit 1, the Court will not reprint each individual hash file number and description of the related contents.

paragraphs of his search warrant affidavit is consistent with his testimony regarding

how BitTorrent works.   Specifically with regard to his use of the term "torrent" in

statements that he downloaded several torrent files which contained numerous

images of child pornography, versus later statements in his Affidavit that torrent files

do not contain child pornography, Ewert stated:

> This type of investigation is extremely technical and
> confusing.   The torrent is the vehicle that allows you to be
> able to get the payload or the content, which is the child
> pornography.   I felt that that was an easy way -- or an
> easier way to simplify the description to kind of help with
> describing this type of investigation.

Doc. 55 at 26.

Ewert also testified that these types of investigations normally are conducted

with law enforcement peers, and that law enforcement commonly uses the word

"torrent" generally to refer to child pornography in this context.   Ewert testified that

he did not, therefore, deliberately or recklessly include any false information in his

affidavit in support of his application for a search warrant.   Ewert acknowledged

that that his Affidavit does not reference the ICAC database, or the process by which

that database obtains the information it provides to law enforcement.   *Id.* at 58.

He also acknowledged that his Affidavit states that he downloaded a torrent file that

contained numerous images of child pornography, but does not explain that the word

"torrent" was used throughout the Affidavit to accommodate the everyday language

of the investigating officers and to simplify the concepts for the reviewing Magistrate

Judge.  *Id.* at 58-59.   Nevertheless, the Court concludes that Defendant has not shown that a *Franks*[8] violation occurred.

The Supreme Court repeatedly has acknowledged that constitutional requirements are to be interpreted through the lens of practicality, and that constitutional policy is best served when courts review affidavits for search warrants "in a commonsense and realistic fashion," because "they are normally drafted by nonlawyers in the midst and haste of a criminal investigation.   Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place . . . ."   *United States v. Ventresca*, 380 U.S. 102, 108 (1965); *see also Illinois v. Gates*, 462 U.S. 213, 241 (1983) ("[P]robable cause deals with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (quotation marks omitted)); *United States v. Miller*, 24 F.3d 1357, 1362 (11th Cir. 1994) (noting that "hypertechnical specificity" is not required and does not comport with the requirement that warrants be reviewed and prepared in a practical and commonsense manner).

The kind of hypertechnical interpretation of Ewert's use of the term ".torrent" urged by Defendant here runs afoul of the Supreme Court jurisprudence encouraging commonsense, practical reading of Affidavits drafted by nonlawyers.   Indeed, "when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting it in a hypertechnical, rather than a commonsense, manner."

---

[8]  *Franks v. Delaware*, 438 U.S. 154 (1978).

*Ventresca*, 380 U.S. at 109.   This Court, in a case remarkably factually similar to the case under review, recently found Defendant's suggested interpretation to be "an exceptionally narrow view of the term 'torrent' … [that] goes against the evidence, law, and common sense."   *United States v. Palmer*, No. 2:15-cr-1-FtM-38DNF, Doc. 68 at 2 (July 8, 2015) (order adopting report and recommendation).   Even if the Court were to agree with Defendant's contention and conclude that the use of the term ".torrent" in the Affidavit was false or misleading—which it does not—there is no evidence that Ewert did so in a manner that was either deliberate or reckless.

The Eleventh Circuit has explained that "*Franks* requires the defendant to offer proof that the affiant had the requisite intent."   *United States v. Flowers*, 531 Fed. Appx. 975, 981 (11th Cir. 2013).   Here, Defendant has failed to offer such proof. At the hearing, when asked whether he deliberately or falsely included materially misleading information in his affidavit, Ewert responded with a resounding, "no." Doc. 55 at 33.   Ewert explained at length that the common vernacular used by law enforcement includes a broad usage of the word "torrent" that officers understand to include and refer to not only the actual ".torrent" file, but also its contents and to whatever those contents ultimately lead–here, images of child pornography.   Even if it would have been a more prudent course of action to clarify the broad use of the term "torrent" in the affidavit, mere "[n]egligent or innocent mistakes do not violate the Fourth Amendment."   *Madiwale v. Savaiko*, 117 F.3d 1321, 1326 (11th Cir. 1997) (citing *Franks*, 438 U.S. at 171).

The Court finds Ewert's testimony regarding his use of the word ".torrent" in

the Affidavit to be credible based on its observations at the hearing and its own review of the evidence.   Without a showing by Defendant that the Affidavit contained false statements made with the requisite intent, there is no *Franks* violation.   Moreover, the undersigned was the judge who reviewed the Affidavit and determined there was probable cause to authorize a search warrant.   The undersigned was not misled by any information included in the Affidavit and remains convinced that probable cause existed for a search warrant to issue.   Accordingly, the Court will not recommend that evidence be suppressed on this ground.

   c. *Whether Defendant was subject to a custodial interrogation without first being advised of his Miranda rights*

  Finally, Defendant argues that he was "in custody" and therefore should have received *Miranda* warnings before being questioned by agents on the second floor balcony of his residence.   Defendant's argument at the hearing and in his briefs was based in part on what he called a "qualified" statement that Defendant was free to leave.[9]   The Government contends that no *Miranda* warnings were required, because Defendant was free to leave and was not required to speak with agents but instead chose to do so voluntarily.   The Court finds that Defendant was not "in custody" for *Miranda* purposes, and therefore no *Miranda* warnings were required.   Because Defendant's incriminating and inculpatory statements were not taken in violation of *Miranda*, they are not subject to suppression here.

---

[9] The particular statement at issue, spoken by Ewert, is as follows: "Ok before we get started want to let you know unless you have someone tied up and gagged hiding in a closet you are not under arrest ok.   You don't have to talk to us; you can leave at any time."   Gov't Ex. 2 at 1.

When determining whether an individual is "in custody," courts look at the totality of the circumstances and whether, under those circumstances, a reasonable "innocent" person in the defendant's position would not have felt free to leave. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996), *quoted in Brown*, 441 F.3d at 1347. In deciding whether a reasonable person would have felt free to leave, courts may consider several factors, including the location and duration of the questioning, whether the defendant was restrained and whether he was released after the interview. *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012).

"[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of *substantial importance* in determining whether a reasonable person would have felt free to leave." *Brown*, 441 F.3d at 1347 (emphasis added). The Eleventh Circuit has found it "significant" that the interview took place in familiar and neutral surroundings and that the defendant acknowledged he understood officers' statements that he was free to leave. *Id.* at 1348 (citing cases). Indeed, finding that a defendant not only was advised that he was not under arrest and was free to leave, but also *understood* that he was not under arrest and was free to leave, is "critical" to determining whether a defendant is in custody for *Miranda* purposes: "[u]nambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the

defendant is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" *Id.* at 1346 (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)).   The Court does not find such extensive restraints here.

Instead, each of the factors for consideration weigh in the Government's favor. First, Defendant was questioned by agents at his apartment.   The Court can think of few, if any, surroundings more familiar and neutral than one's home.   Defendant was repeatedly told he was free to leave and need not speak with law enforcement at the beginning of the interview, and again later during the interview.   *See* Gov't Ex. 2 at 1; Gov't Ex. 3 at 1.   Similarly, when asked whether Defendant was talking to the agents of his own free will, Defendant confirmed that he was.   Gov't Ex. 3 at 10.[10] By the time Defendant agreed to be interviewed by agents, he was fully aware of the

---

[10]  The context of the statement is reprinted below.

[Bunch]: -are, are, are you talking to us on your own freewill?

[Defendant]: I am.

[Bunch]: Alright and I appreciate you doing that too again how's our treatment been of you?

[Ewert]: You're not handcuffed against the wall, you've been able to come and go, we're not forcing you to say anything you don't wanna say? We haven't promised you anything, any pot of gold at the end of the rainbow or anything like that?

[Defendant]: Of course not.

[Ewert]: Ok.

[Defendant]: Yeah.

[Bunch]: The, and the main thing is –

[Defendant]: I wanna help so whatever.

Gov't Ex. 3 at 10-11.

agents' true purpose at his residence and volunteered to speak with law enforcement even after being told that he was not required to do so.

As to Defendant's contention that the location of his interview on a second floor balcony converted the interview into a custodial interrogation, the Court disagrees. While true, as Defendant argues, that "Mr. Hall's only form of egress was through the apartment being searched by multiple TFAs," this fact, standing alone, does not amount to a restraint so extensive that TFA Ewert's and Bunch's repeated statements that Defendant did not have to speak with them and was free to leave cannot cure any custodial aspects of the interview.   Doc. 28 at 19; *Brown*, 441 F.3d at 1346.   Ewert testified that the interview took place on Defendant's lanai and described the interview as a "very relaxed atmosphere."   Doc. 55 at 40.    Ewert also testified that he "reiterated again that unless it was an extreme circumstances, that he wasn't under arrest and he could leave at any time he wanted," but Defendant never asked to leave, which is confirmed by the audio recording and transcripts.   *Id.*; *see* Gov't Exs. 2-4.

Although Ewert conceded on cross examination that the lanai was really a porch on the second floor of the complex that overlooked a body of water, and the only way to get to the front door to exit would be to walk through the apartment and the agents searching the apartment, the fact remains that Defendant was told he was free to leave but never expressed a desire or attempted to do so.   *Id.* at 70. Moreover, after approximately thirty minutes they moved inside Defendant's apartment to his master bedroom to finish conducting the interview due to the hot

temperature outside, so the last approximately one hour of the interview did not take place on the balcony.   *Id.* at 40-41, 43.   At the point everyone moved inside, or at any point during the interview, if Defendant wished to leave or cease speaking with the TFAs he could have done so.

The undersigned listened to the audio recording of the interview, as well as reviewed the transcripts of the interview, and concludes that the interview was not inherently coercive.   Defendant agrees that the agents were "nice" and treated him well.   *See* Gov't Ex. 2 at 67 (Detective Bunch: "Isn't it nice, aren't we nice to talk to?" Defendant: "You guys have been fantastic….").   Defendant also acknowledged on at least four separate occasions that he was speaking with law enforcement because he wanted to and wanted to help them, not because he felt that he had to.   *See* Gov't Ex. 2 at 25 ("I just wanna cooperate you know if I can."); *id.* at 57 ("Anything I can do to help at this point you are absolutely [sic] have my help."); *id.* at 66 ("Anything you guys need."); Gov't Ex. 3 at 11 ("I wanna help so whatever.").

"*Miranda* does not erect an absolute *per se* bar on any conversation with the accused by the investigating officer.   It must be applied instead with flexibility and realism."   *United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir. 1984).   The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."   *California v. Beheler*, 463 U.S.1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) (noting the Supreme Court's position that the "ultimate inquiry" is whether there is a restraint

on movement similar to that of formal arrest).   Based on the facts of this case, the undersigned concludes there was not.   Because the Court finds that Defendant was not "in custody," no *Miranda* warnings were required before agents began their interview with Defendant.   Accordingly, the Court will not recommend suppression on this ground.

## IV.   Conclusion

For the foregoing reasons, it is **RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress (Doc. 28) be **DENIED**.

**DONE** and **ENTERED** at Fort Myers, Florida on this 10th day of July, 2015.

CAROL MIRANDO
United States Magistrate Judge

Copies:
The Honorable John E. Steele
Counsel of Record